Good morning, Your Honors. May it please the Court, my name is Bradley Duncan. I'm an attorney with the law firm of Davis Wright Tremaine, and I represent Richard J. Sampson, the Chapter 7 trustee in the bankruptcy proceeding of Edra Blixseth. The bankruptcy proceeding from which this appeal arises is pending in the United States Bankruptcy Court for the District of Montana, and this appeal is from a determination by the Bankruptcy Appellate Panel for the Ninth Circuit, which was rendered in May of last year. Your Honors, the issue before the Court, which I believe to be one of first impression, is this. Is the remedy available, afforded by Section 362H of the Bankruptcy Code, a remedy which involves the expedited termination of the automatic stay in bankruptcy and the dropping out of the estate of all of a secured creditor's collateral, available where, as here, the debtor's sworn schedules both misdescribe the collateral at issue and, in certain respects, fail to identify the collateral at all? We believe the answer to that question is no, and that the expedited and extraordinary remedy provided by Section 362H of the Code is available only in a circumstance in which the debtor's schedules have identified the collateral and identified the collateral as security for a secured creditor's claim, so that the trustee and other creditors in the case are aware that the collateral exists and are able to take action to protect their interests in the case. Your Honors, the bankruptcy process is rooted deeply in the concept of accurate disclosure. A debtor is required to disclose all of her assets and all of her debts. It is intrinsic to bankruptcy that parties be given, as to all matters, notice and an opportunity to be heard. Informed decision-making by both the court and the participants in a bankruptcy process are intrinsic to the bank. Informed decision-making is the touchstone of the bank. Mr. Duncan, what is the incentive to Ms. Blixeth accurately to list all her assets which she pledged pursuant to her loan agreement to Western Capital? She's going to lose those assets to a secured creditor just as quickly as surely as she will lose them to a trustee in bankruptcy. Well, perhaps, Your Honor. In terms of the specific incentive, the submission of knowingly inaccurate or fraudulent schedules is a federal crime. So there is a penalty associated. That's not charged here. It is not. It is not a reason. Let's put that off to the one side. But in your general policy argument that you've been making up to now, you've been saying that the elimination of the automatic stay should not affect assets which are not scheduled by the secured debtor. But I don't see the incentive to schedule the assets. Well, a debtor is obligated in the first instance. I can see from the point of view of the creditor, secured creditor, taking action to make sure that the debtor schedules assets because it's cleaner that way. Sure. Well, understand that we represent the trustee in the case. And in a Chapter 7, an individual Chapter 7 case, which is what this one was, a trustee is always appointed. The trustee is very different than the debtor. The individual debtor is obligated in the first instance to prepare the schedules. They're submitted to the bankruptcy court, and the trustee relies upon those schedules. Those schedules, and particularly a schedule of assets and liabilities, specifically requires the debtor to identify all of its assets, all of its creditors, and to identify which of the assets secure the claims of particular creditors. Does the trustee have the power to call in the debtor and say, have you any pledged assets to your secured debts which you have not listed here? Yes. Then why didn't the trustee do that in this case? It's a $13.5 million loan, which is secured by assets which are clearly not $13.5 million. Correct. Well, the trustee did. The trustee did. There is, under the bankruptcy code, something called a meeting of creditors, and it is required to occur within a specified time. And it's typically very early on in the case. And the meeting of creditors occurred here, and the trustee did interrogate the debtor. And in this case, the debtor is a woman by the name of Idri Blixa. And this information, the existence of the collateral we're talking about here, was not disclosed during the meeting of creditors. The trustee came out of the meeting of creditors with two pieces of information that he was entitled to rely upon. Western Capital has made arguments about the fact that certain information may have been available to the trustee, but as a matter of law, the trustee came out of the meeting of creditors with two pieces of information, the substance of the meeting, the debtor's testimony at the meeting, and it's recorded and it's sworn, and the schedules. Those are the two things, as a matter of law, we believe he was entitled to rely upon. The meeting didn't disclose the existence of this collateral, and neither did the schedules. And to get to what I think may be your honors. Wouldn't that have been disclosed by the loan agreement to Western Capital? I mean, shouldn't the trustee have reviewed the legal documents and then been able to go back in an informed way and go back to Ms. Blixeth and say, hey, look, you only listed the Yellowstone property. But as I read this document, it looks like there's other things here that you may have pledged. Did she disclose those documents? Wouldn't that have come out in all of this? It is unclear in terms of the record as to whether the trustee had access to the Western Capital loan documents. In the first instance, as a practical matter, it's unlikely that they would have come from the debtor. I'm sorry, it's more likely that they would have come from the secured creditor. On the facts of this case and the record that's been created, it's not clear whether Mr. Sampson had those loan documents, but let's assume that he did. It was a $13 million loan. It just seems like the kind of thing that you would have wanted to check. It was a $13 million loan, and this was a very, very large case. The debts here are in the range of $200 million. The assets, the scheduled assets, are in the range of $70 million. This is a very large case. $13 million is a lot of money, but understand the circumstance the trustee is operating in, in a very short time frame. Remember that Mr. Sampson was appointed trustee on May 29, 2009. The deadline for his taking the action contemplated by the statute on the facts here was June 30. So he had a month. He had been in this case for a month. This is a very large case.  The assets here are very, very substantial. But to return, Your Honor, to your question, let's assume that Mr. Sampson had the loan documents and had scoured them, evaluated them very closely. The only thing those loan documents would have disclosed is the breadth of Western Capital's lien. That Western Capital was asserting a lien against essentially all of the debtors' assets. What they would not have disclosed or identified are the assets themselves. And that's really the rub here. The problem is that under the… Let me just stop you there, and then I'd like you to continue. Of course, she's listed on her schedule that it was personal property, comma, you know, the Yellowstone property. And the Yellowstone property is not mentioned in the legal documents, specifically. Correct, but no particular property is listed. Right, but the fact that she's now listed something very specific that was not listed in the legal documents might have set off some bells and whistles. It says, have you got something else here that shows the Yellowstone property was actually pledged? Because you've said that here, but I don't see this anyplace else in anything that looks official. I take your point, Your Honor, and I understand it. And I'm not here to argue that had Mr. Sampson had all sorts of tools available to him and all sorts of time and incentive actually specifically to inquire, a reason to inquire specifically into the nature of Western Capital's loan, or excuse me, collateral package, that he couldn't have done that. But you need to understand we're talking about a very, very expedited process. We're talking about essentially a month after his appointment as trustee. Could a trustee in this circumstance, in theory, undertake the sort of very comprehensive investigation that I think Your Honor is talking about, and if he's going to do it with Western Capital, it stands to reason he's going to do it with all of the other creditors in the case, of which there are very many. Could it have happened? Yes. The question is whether, as a statutory matter, the trustee is obligated to do that. Pardon me, Mr. Duncan, and educate me because I'm far from an expert in bankruptcy, but I took a note here that the assets of the debtor were $70 million. The disclosed personal property was, I think, in the range of $69 million. Right. When was that disclosed? In the schedules. In the schedules filed at the beginning of the bankruptcy? The schedules that were operative at the time the trustee conducted the meeting of creditors had been filed, I believe, on June 6th. All right. So by June 6th, the trustee knew two things, that there were $60 million of assets, that there was a loan agreement with Western Capital, that there was a pledge agreement to secure the loan, and that the only asset scheduled was the Yellowstone property. But he also knew there was $69 million of assets otherwise, and the loan agreement itself said all personal property. Why didn't he, at that point, raise the issue as to whether any of that personal property was also pledged? Your Honor, if I could, Your Honor, I think you're assuming as a factual matter that in this circumstance the trustee actually had available to him the loan documents. I don't think that's been established as a record matter. All right. It's not impossible that he did, and I'm certainly prepared to discuss the circumstance, a circumstance in which he did. I would submit that the code doesn't impose upon a trustee in that circumstance, if we assume that Mr. Samson, the trustee, had all of that information available to him. I would submit that the code doesn't obligate him to actually undertake this sort of investigation. But the trustee has to know what sort of an estate he will have to administer. The property properly pledged to a secured creditor is outside of the estate, right? No. Property pledged to a secured creditor is typically included within the bankruptcy estate. But it is not available to general creditors. To the extent that it's pledged to a secured creditor. So he's got to know what is the overall assets that this woman has and how much is already pledged to secured creditors and is not available for general distribution to creditors, right? Over the course of the case, that is correct. But I do want to bring the Court back to the fact that we're talking about an extremely truncated period of time here, and the imposition under 362H of a very expedited remedy. I would agree with Your Honor that ultimately, and this case was filed in the spring of 2009, it is still pending. It is still extremely active. There is still very active litigation in this matter. So we're talking about essentially the first 30 days of a Chapter 7 proceeding that has now been pending for over three years. So I think that's really important. I understand the context of Your Honor's question, but I think it's important for the Court to understand, particularly in a case of this magnitude, things simply can't happen that quickly. He does have a meeting of creditors in which he examines the debtor. That's correct. And I suppose question number one is, what are your assets? That is correct. And the assets and the touchstone for that inquiry, the document from which all of that inquiry flows is the schedules. And in this case, the schedules would not have told the trustee what he needed to know. Do you want to keep some time for rebuttal? I do, Your Honor. We'll add an extra minute on your time if you can plan that. All right. Thank you, Your Honor. Thank you. Mr. Riper. Hatch. No, Mr. Hatch. Thanks for coming from Denver. Thank you. May it please the Court, Robert Hatch on behalf of Western Capital Partners. As this Court noted in In re Dumont, because of the importance of secured lending to the nation's economy, secured creditors have been the subject of particular congressional solicitude. And it was that solicitude that gave rise to the creation of 362H. The provision was added as part of the 2005 Bankruptcy Abuse Prevention and Consumer Protection Act. And it was enacted for good reason. It requires prompt action by the debtors and by trustees to voice their concerns about a secured debt or otherwise a secured lender is free to protect its interests, invoking state law remedies. And 362H only applies to personal property, not real property, because personal property is movable. It's subject to being abused, lost, and dissipated. And this is why Congress requires the debtors and the trustee act quickly to identify what personal property they intend to keep, what property they intend to surrender, and how the secured creditor can be protected. And it forces them to make these prompt decisions so that the state law remedies can be invoked and the secured creditor can be protected. The trustee argues that without any support in the record, I might add, that the application of 362H will result in Western Capital taking more collateral than is needed to repay its debt. In his papers, he suggests that Western Capital is free to take over 60 or $69 million worth of scheduled assets to satisfy its $13 million debt. First, there's nothing in the record to support the collateral foreclosed by Western Capital is worth its debt. The personal property that's been foreclosed upon consisted of household furniture, jewelry, stock, and insolvent companies and contingent contract claims that are the subject of litigation. Indeed, the record's clear, and at the time of the hearing, and it's clear still today, Western Capital is still owed many millions of dollars and will likely never be made whole. But if it were true that Western Capital was foreclosing on more collateral than necessary to repay its debt, if that were true, it would be subject to state law. Article 9 of the Uniform Commercial Code protects against secured creditors overreaching. The breach of contract claims would be available under the loan documents. As this Court said in a footnote to Dumont, we hasten to note that Dumont and the debtors in her position are not necessarily a remedy. Both Dumont's and Ford's rights and remedies under their contracts are defined by and brought into existence by state law. In fact, the trustee has availed himself of certain remedies. There's pending adversary proceedings. That's part of the record where the trustee is seeking to set aside the Western Capital security interest. Mr. Hatch, could I ask you a question? Yes, sir. Is there any indication in the record which can satisfy us one way or the other that the trustee had available to him the loan documents and the pledge agreement of all personal property in the period of time, in that May-June period of time? Yes, Your Honor. The trustee was appointed May 29th. Within two days of the appointment, Western Capital submitted to the trustee the loan package and a map describing how it is, or a chart describing how broad the security interest was. That is part of the record. It's one of the initial exhibits that were introduced at the hearing. And I apologize for not having the exhibit number, but there weren't that many exhibits. I think there were only like ten exhibits. And so if you look at the first few, you'll find it. It was an email along with attachments that included a description of the loan, a description of the collateral, and it gave the trustee a heads-up on the Western Capital claim. When you say descriptions of the loan, that's a promissory note. Yes. Did it have the security agreement which extended the security interest to all personal property? I believe it did, Your Honor. You believe it did? I do. I apologize for not having the record right with me, but I believe it did. The email was intended for that very reason. Where would I look or where would I send a clerk to look to determine that this is in the record? Can you give me some pages of the excerpts of record? Judge, and I apologize, not having the exact pages, but it's an email that has one page in length that has attached to it all the loan documents, I believe all of the loan documents, all of them, along with a map, a handwritten map that explains the scope of the security interest. And it's one of the first exhibits that were admitted into evidence by the court. By which court? By the bankruptcy court. So it's part of the record in this case. It was admitted by stipulation and by the court itself. And there's yet another additional reason. Do you know if it's in the excerpts of record that were filed? Yes, it is. Okay. It is. It's one of the very first exhibits, as I say, I'm repeating myself, but it's in the record. There's another very simple solution here, especially when you're dealing with a sizable bankruptcy. A perfected security interest in personal property is perfected through the filing of a UCC financing statement. It's one, you know, it's very simple. It takes just a few minutes to do a UCC search where the debtor resides. All you have to do now under the current UCC is just do it where the debtor resides. It would have been one search in California to determine what financing statements have been filed to perfect a security interest. Did you file with the trustee a UCC-1 as to the secured property? We filed a UCC financing statement with the Colorado Secretary of State, and I believe it's part of the exhibit package. Let me rephrase the question so that you don't have any question as to what I'm asking, Mr. Hatch. Okay. Did you serve a copy of a filed UCC-1 with your package of documents two days after the appointment of the trustee, yes or no? Judge, I'd love to answer yes or no. It's part of that package. I believe it's in there, and I just don't want to say something that's not accurate. These are pretty important documents for you to bring to the oral argument. Well, you're right, Judge. It's hard to know exactly where things were going to go. There's a number of things I intend to address, but the financing statement would be something the trustee would have available to him. And to not just understand the Western Capital security interest, because Western Capital had no duty to provide the trustee with any security documents. The only triggering event that causes 362-H to apply is the scheduling of a claim. That's it. 362-H says that when a debtor's schedules contain a claim, then that's what triggers the trustee's and the debtor's obligation to take steps to protect that. And there's another thing that the trustee could have done very, very simply here. Under Rule 1019 of the Bankruptcy Code, the trustee could have asked for an extension of time beyond the initial 30 days to permit the filing of a statement of intent. And so that would have been a very simple thing for the trustee to do. Again, he chose not to. And, in fact, at the hearing, there was an initial hearing that was scheduled on this in October 2009. And in the 2009 hearing, Judge, 362-H was brought before the court, and the court agreed that it had taken effect and that the personal property of the debtor was no longer a property of the estate. And the trustee agreed on the record, which is, again, part of this record, that 362-H had taken effect. And he didn't argue that there was some exception. He didn't have sufficient information. He acknowledged some four or five months after the initial meeting of creditors and after having received the schedules that 362-H had applied and taken effect and that it was Western Capital's... And where would we find that in the excerpts of record? That's in the October 2009 transcript that's part of the record? I'm thinking that possibly we should let you, Mr. Hatch, and Mr. Duncan, both submit a supplemental letter to the clerk of the court to come to our panel with the citations to the record documents that any judges on the panel have inquired about. If that's all right with my colleagues here. It's certainly all right with me. I would be happy to do it. It would be very short, and I apologize, Your Honor. I've prepared so many different things, and I didn't commit... It's hard to know where a panel will be coming from with its questions. So that will let you concentrate on your argument. But both of you can get that to us. When you send that to us, be sure to send a copy to opposing counsel. I certainly will. Each of you, so that if anything needs comment, there's a chance. So as I say, the trustee had the opportunity to file a motion of consequential value with the court within 30 days or could have sought to extend the period of time pursuant to Rule 1019 of the code, but he chose not to. And 362H is self-effectuating, and it caused the property to be removed from the lifting of the stay. Now the trustees would like to have the court write into 362H a new requirement, a new requirement that the exact property that was pledged to secure the debt be described in the schedules. And he would like to read, he would like to add the words that is scheduled under 521 in 362H, and it just isn't there. Congress knew enough to add that language when it wrote the abandonment statute, which is 554C. In that instance, Congress required that certain assets be specifically scheduled in order for that code provision to take effect. And that is the reason why it would be unworkable to have the debtor or to rely upon the debtor to specifically describe all nature of personal property as you're dealing with sometimes intangible personal property, tangible personal property, and property that may be difficult for a debtor to completely understand. He or she may not understand the scope of a pledge. And in this instance, the schedules do list, and I believe list all of the categories of property of this debtor. It's not the question as to whether or not the debtor was truthful with completing her schedules. The question is whether or not in addition to listing the property, she needed to specifically explain how that property was encumbered by the Western capital security interest, which is simply not required for the application of 362H. And so the fact that Congress chose not to add those words into 362H is a compelling reason as to why the Western capital interpretation should prevail as opposed to the trustees. The description that she did include was a description that said all personal property owed by debtor, comma, family compound at Yellowstone Mountain Club. And that's a pretty significant statement to say all personal property owed by debtor. It doesn't say at the family compound. It says, comma, family compound. And as I say, that would have triggered, I think, inquiry if nothing else for the trustee to inquire. And we certainly, you'll notice when I provide you with a citation to the record, that Western Capital reached out to him within two days of his appointment and made itself available for discussion to explain and to answer any questions. And there was certainly no obligation for Western Capital to do that. Really, in this instance, 362H has worked exactly as Congress intended it to. It caused the stay to lift, and it caused it to lift when the schedules explained that there was a claim, a secured claim, and the trustee and the debtor chose not to take action to prevent the lifting of the stay. And it's not just the trustee, but the debtor would have had a natural incentive to file a statement of intent if the assets were of enormous value. I just want to thank the Court for hearing our position. It's been an honor to appear before you. Thank you. Well, we thank you for coming here from Denver, and we appreciate the argument. And, Mr. Duncan, Kathy, could you add? I said I would add a minute for Mr. Duncan's rebuttals. Sure, I'll certainly be brief, Your Honor. And I'd like to address three points in particular. I think Mr. Hatch, in his description of the trustee's position as to all of this and why it matters, may not be entirely accurate. He suggested that the trustee is concerned about the risk that, if all of this happens under 362H, Western Capital will be able to foreclose upon more property than is necessary to pay its claim. That's not what we're talking about here. That's not the risk that flows from all of this. Western Capital will never be entitled and will never be in a position to pay itself more than it is actually owed. What the risk here is is that property that may be subject to Western Capital's lien will fall out of the estate, and Western Capital may foreclose upon it, get itself paid, but the additional property that may have initially been subject to the lien will also fall out of the estate and will therefore never be available to other creditors of the estate. The bankruptcy process is all about ultimately protecting the interests of unsecured creditors. But once the noteholder has satisfied against secured property, if he's holding anything over that amount, he's got to return it, doesn't he? No, not under 362H. No, but under the UCC, he can't hold secured property after his debt's been satisfied. Well, he can't foreclose upon it, correct. If he holds it, he probably does have to give it back. It's conversion. Well, yes. If he ultimately pays himself out of collateral more than he's due, that is conversion. The problem here is that if all of this property, this excess property we'll call it, falls out of the bankruptcy estate by virtue of the operation of 362H, it will never become really available to satisfy the claims of other creditors, other unsecured creditors. The losers in all of this, Western Capital is a big winner as a result of this, but the losers in all of this are the holders of other unsecured claims against the estate. Why wouldn't the excess beyond what's needed to satisfy the debt come back into the estate for the benefit of the creditors? Because it doesn't, because that's the operation, and you're touching upon what really is the critical concern here. Once that property leaves the estate within the 30-day period that we talked about earlier, it is gone forever from the estate. It's still Mrs. Blixeth's if it's not necessary to satisfy the debts of Western Capital. Yes, it redounds to the benefit of Mrs. Blixeth. And she's under an obligation under Title VII to forward her assets even after discovered assets so long as the bankruptcy isn't in vigor, correct? No, I don't believe that's correct. I don't think she is. She can just take the surplus and go to France. Yes, I think she can do that. I think under 362H that is precisely what she can do, and that's what makes this remedy so extraordinary. And this has been helpful because it really highlights the significance of this result. We've talked about whether the trustee should have, you know, looked at one of the many sets of papers that were being delivered to him. Let's assume he tripped up. Let's assume that it was sitting on his desk under a big stack of stuff, and in the 30 days he had available to him, he didn't look at it. Is that the sort of trip up, the sort of mistake that ought to justify this sort of really extraordinary remedy under the statute? How often is it likely that there will be some excess that would go back to the debtor and therefore be eligible to, you know, be available for her to go and fly to France? If that's not likely, then there's not really a problem. If it is likely, then, of course, you've got the whole possibility of fraud. That is that she has not disclosed everything in hopes that the secured creditors will come in, take some portion of the estate, she gets everything else and can go to France, and then we've got a criminal problem, don't we? We do. We do, but I think that's relatively cold comfort to the unsecured creditors as to whom these assets may have disappeared. I'm sorry, Your Honor. Well, we're over time now. Okay. And there are other people waiting for argument. All right. So what I'm going to suggest is that we bring this to a close. The panel may be mystified by some of the issues in the case. If it wants, it will call for a supplemental brief. But at a minimum, both of you can submit those citations to the documents in the record that people asked about. Yes. Does Judge Bybee or Judge Bea have any further questions? No. Thank you, Your Honor. Thank you. Okay. Well, again, Mr. Hatch, we thank you, and Mr. Duncan. And this case, we will defer submission for one week to get those citations. But then we'll turn to it. Okay. But the sooner you can get them to us, the better. Okay. Thank you. The court is recessed. All rise. The court is recessed. All rise. The Ninth Circuit Court of Appeals. The United States Court of Appeals for the Ninth Circuit is now in session. You may be seated. Good morning, and thank you for your patience through a busy morning for the court. We're pleased to have reconvened.
judges: Gould, Bybee, Bea